19-5231 Baan Rao Thai Restaurant et al. Appellants v. Michael R. Pompeo, Secretary of the U.S. Department of State and United States of America. Mr. Pollock for the Appellants, Mr. Glover for the Appellees. Good morning, counsel. Mr. Pollock, please proceed when you're ready. Thank you. Good morning, your honors, and may it please the court. My name is Scott Baan Rao Thai Restaurant and the individual petitioners, Mr. Thompson and Ms. Saksai. What has happened to the petitioners in this case sort of shows the lack of any effective mechanism for them to pursue their rights under the Treaty of Amity and Economic Relations between Thailand and the United States. I want to take just a very short time to sort of go over the fact that the Thai Restaurant has been in operation for some 12 years. Both of the individual petitioners have worked for it successfully for a number of years. Mr. Thompson had several, in addition to being granted an E-2 visa to come to the U.S. to work for Baan Rao Thai Restaurant, he was successful in extending his status a couple of times. The third time the restaurant sought to extend his status, they were denied. They went to court to challenge that court, but the agency, the USCIS, reopened its decision and granted his extension one more time until the third quarter of 2018, having not visited his... Why was that in California, Mr. Pollack? Because the decision denying the extension came from the USCIS's California Service Center. And is that, the restaurant is in North Dakota? Correct. Why, I'm just not familiar with the work allocation issues. There was venue, venue was appropriate in the district court, Central District of California, and that's where the restaurant chose to bring suit. Why, why was Mr. Thompson applying in California? Because all of the, all E-2 extensions go to a service center and it was assigned to the California Service Center. So after he was granted the extension, when the service reopened on its own motion, he reasonably wanted to travel, take a land to visit his family. It had been a number of years and he had every intention of returning to the same work, same work conditions that he had been serving the restaurant for a number of years. And when he went to apply for his new visa, he had no reason to believe that he would be denied there. But of course he was, and the restaurant scrambling for other chefs to take over necessary functions in the restaurant. They also had their former employee, Ms. Sucksai, apply and she too was denied. The reasons that the consulate gave for denying these visas was that they did not meet the test for essentiality in the state department's regulations. And they were told to leave the consulate and that was the end of it. So having litigated the question of Mr. Thompson's eligibility for an E-2 visa, the restaurant was there is no formal mechanism for reconsideration. And so they brought suit in the district court in the District of Columbia. Can I ask you, Mr. Pollack, is it in the record whether either one of these plaintiffs was eligible for a different status, green card or some of the other status, some other status that would allow them to stay? It's not in the record, but there would be no other status for them to work for Ban Rao Thai Restaurant. So when we look at the treaty between Thailand and the United States, we have to look at its purpose, its intent, the terms of the treaty, how they operate and what they say. So can I ask you this question just as a framing matter? Sorry, Judge Pillar, I'm sorry. You can ask your question. No, no, no, go ahead. Okay, thanks. So just as a framing matter. So you don't dispute the existence of the doctrine of consular non-reviewability. It is a doctrine that exists and it has been applied to deny judicial review of matters that are at least in this space. And so it seems to me the question is, if that doctrine exists and it has existed for a while, there's a Supreme Court decision back in 1950 or somewhere thereabouts that at least manifests that principle, then would we not read the treaty against the backdrop of that doctrine? And if we do, what is it specifically in this treaty that would give us a sense that that doctrine shouldn't apply particular to this treaty in a way that it wouldn't sweep in all treaties that have this kind of free access provision? Yes. Well, we do not dispute that the doctrine exists and that it has been applied in this area. What is different about this treaty and this case is that the treaty was enacted and ratified by the Senate specifically for the purpose of protecting American citizens and their interests abroad and providing reciprocal rights to Thai citizens who are seeking to establish businesses in the United States as well as their employees, their responsible employees. So the other cases that have recognized the doctrine of consular non-reviewability have not addressed a treaty where the person was seeking a visa in the category that the treaty protections covered. So you would have cases, for example, in this court's Saavedra Bruno decision where you're seeking, where the person was seeking a visa for a family member. Other cases like in the Supreme Court, the Klein-Dienst v. Mandel case where the person was seeking to come in as a visitor and was not specifically protected by any treaty provisions. So Mr. Pollack, when you say that your clients were protected by treaty provisions, you're referring to the treaty, Article 1, Section 1, saying that nationals of either party shall be permitted to enter the territories of the other party and that that includes employees. So shall be permitted, that's the language? That's the treaty language, Your Honor, but we don't stop there. In addition, Congress has specifically recognized a right to enter the United States in its definitional section for the E-2 visa where they say, they describe the person who's entitled to enter the United States under the treaty. So entitlement is, by definition, a right to partake in a particular benefit. But isn't it part of your claim that you're taking issue with the E-2 visa requirement that the person be an essential employee and you're reverting to the treaty? So, I mean, it does seem like, I'm not sure that I follow the logic of that claim because an E-2 visa is restricted to somebody who's an essential employee. Well, not by the terms of the treaty itself. No, but by the terms of the very visa that you're seeking for your clients. But there is no, outside of the State Department's interpretation of the treaty, which says that it should apply to persons holding responsible positions with the employer. Essentiality is a construction of the State Department. We have two different claims. They're separate, but they are related. The second one is an ultra-virus claim that would impact future applications for E-2 visas under this treaty. So we're challenging the policy interpretation of the State Department, as well as the application of that policy to these visas that were denied. Can I ask you an interpretive question about the free access provision, so Article II, Section 2? Yes. It speaks in terms of the nationalities and companies of either party having free access to and in the pursuit of their rights. And I'm just wondering, are the rights that we're talking about their rights under this treaty, or is it just a more generic provision that just speaks of rights generally? Well, the way that I read the treaty, Your Honor, is it starts with Article I, that specifically sets out certain expectations or in our view. Then Article II talks about a mechanism for a hearing into those rights. But you think it just says their rights. It's only talking about the rights that are set out in the treaty. It's not just a generic statement about rights. That's correct. Correct. Although there may be situations in which companies are litigating other types of rights, for example, in Article III of the treaty, it talks about protections for contractual rights, employment, things of that nature. Right. In fact, isn't it most naturally read, it's in Article III, Section I, that the treaty recognizes a right to fair and equitable treatment regarding property and enterprises and any action that would impair legally acquired rights and interests and shall ensure that their contract rights are effective means of enforcement. It just strikes me that a natural reading of the treaty talking about property and contract rights in Article III and then in Article I, it doesn't use the term right, a right to enter the territory. It just says nationals of either party shall be permitted to enter. Given the backdrop of consular non-reviewability and given the backdrop of national sovereignty, why shouldn't we read this as an undertaking between nation-states, qua nation-states to say, I undertake to let your people in, you undertake to let my people in, pursuant to visa categories and executive visa processing that is otherwise available, C-E-G-E-2 visa? The reason, Your Honor, starts with the first word of the treaty, which is nationals of either party. So it recognizes the importance that this is creating a type of focus on the individual, not on the nation. The Article II right to access to courts also starts with the word nationals and companies of either party. So the treaty itself focuses on individual rights and then in Article III, it shifts to obligations of the states to provide particular treatment of which we would say, that doesn't take away the access to courts in Article II and it doesn't take away what we consider to be the right to enter the United States, the treaty language supplemented by the Immigration and Nationality Act. Do we know – excuse me. Do we know, Mr. Pollack, why these applications were denied? The embassy in Bangkok didn't say in what respect that they didn't meet, quote, all the requirements of an E-2 essential employee, but the consular official so determined that they didn't meet all the requirements of an E-2 essential employee? So one of the problems that all visa applicants have in who are denied a visa is that they are not given a reasoned explanation of the reasons why they're denied. And we would hope that this court would hold that because the doctrine of consular non-reviewability does not reach to this particular case, that we would have a sort of review process by which the consulate would have to explain itself. Now, this is not the same area as these other cases that are cited throughout the briefs and the district court's decision where they're – sorry, I'm losing my train of thought. Well, let me just ask you, and hopefully that'll come back to you. And I think it's in your complaint that you allege that a consular officer told these applicants that new rules prevent the embassy from issuing E-2 visas to chefs. Correct. As essential employees. So they – it sounds like there was just a policy determination that they were going to restrict people in this category and – but in your view, that would not be an adequate reason? No, because it would really make no sense. I mean, chefs are essential to a restaurant's operation. And I think that one thing that happens is that occasionally consular officers will say just about anything so that the person will leave after a decision has been made. And so I don't take this as a statement of State Department policy or a change that no Thai chefs anywhere will qualify for an E-2 visa. We really don't know why these particular applicants were denied after so many times of already being issued visas and being able to extend their status in the United States. And we would hope that the same process of review would apply to this case that would apply when Mr. Thompson and Ban Rao Thai Restaurant applied to the court to review a negative decision. I don't see a reason to have a different court access, whether the person is initiating it from the U.S. or whether the company, which is still here, initiates it with them outside of the U.S. And in your ultravirus claim, your assumption is that a responsible employee is a broader category than an essential employee? Yeah, I think that essential is a more vague term. I think it's more general. It's harder to understand who is essential. It's more restrictive for sure. I don't know. I mean, one way of reading responsible employee is somebody who's actually in charge of the enterprise, a manager, someone who's really running the show, employee employed by an investor in a responsible capacity, responsible for the success of the investments, perhaps. But you don't have any authorities that really go to how we should understand that. I'm unaware in the absence of definitions or court interpretations. We just don't know what these terms should mean. But I do think that essentiality is a more exacting standard than responsible. Responsible could be a manager, but a chef can certainly be managing the kitchen and the food. So I think that in my view, responsible is a broader category than essential. Okay. Thank you. Let me just make sure my colleagues don't have further questions for you before we give the government a chance. Thank you, Mr. Pollack. We'll give you some rebuttal time. Mr. Glover. Morning. May it please the court. I'm Matthew Glover, and I the Doctrine of Consular and Honor Reviewability bars review of both the plaintiff's claims. And as the questioning this morning goes to, I think Chief Judge Srinivasan, you narrowed it to they agree that the Doctrine of Consular and Honor Reviewability would normally apply, but they read the treaty as abrogating that. And we do not. We believe the treaty is one in a long line of treaties. This is a shortened version of this long line of treaties of friendship, commerce, and navigation that allow, among other things, access to court. And these access provisions as described in our brief, and as explained by Judge Friendly for the Fifth Circuit in Blanco versus United States, pertain to procedural rights, rights like the availability of a lawyer, not having to pay filing fees, et cetera. And so reading the treaty against the backdrop of our law, including Consular and Honor Reviewability, it does not create a new substantive right to come into court and challenge your exclusion under an E-1 or E-2 visa category. Mr. Glover, is the Consular and Honor Reviewability a jurisdictional doctrine in the sense that it's necessary to decide it even if it's not raised in the narrow ARBA sense? That's a difficult question. I think after Trump versus Hawaii, in which the Supreme Court pointed to a concession by the Solicitor General at page 13 of the oral argument transcript, that it was not jurisdictional in the subject matter jurisdiction sense. The Supreme Court there thus went on to the INA and constitutional questions dealing with whether the President's exercise of 8 U.S.C. 1182-F and 1185-A authority was lawful. I mean, I appreciate the If we agree with you, do we have to get permission from our colleagues on Bank in view of Saavedra, or do you think that Saavedra is not clear in viewing it as subject matter jurisdictional in that particular way? I would make a couple of points to this, Your Honor, and I would, before I do that, note that the screen paused for a second, so I want to make sure everyone is hearing me and make sure I haven't cut out. Yeah, we could, at least I can. Sorry if my Wi-Fi is not strong. It may be my Wi-Fi, Your Honor. I just wanted to make sure, but a couple of points to that. I think the Seventh Circuit describing Saavedra pointed out that Saavedra was issued, you know, around the time of Steele Co. and at a time in which jurisdictional was maybe used more broadly, and this Court has said and was repeated in Steele Co. and been repeated by the Supreme Court a number of times that jurisdiction is a word of many too many meanings. The analysis in Saavedra is still appropriately applying Mandel, appropriately applying Fialo, appropriately applying all of these doctrines, appropriately looking at the INA provisions, giving consular officers authority to make denials that's not reviewable even by the Secretary of State, and so we think consular non-reviewability supplies a rule of decision, sort of a non-subject matter jurisdiction, but just disability doctrine. Right, and the end that Saavedra is proper, treated, appropriately read as so treating it, that's the key point for purposes of my question about what we would have to do as a panel bound by prior panels. Iron's footnote, not iron's footnote. I would think you don't need an iron's footnote to treat Saavedra's use of jurisdictional as sort of this more vague non-subject matter jurisdictional sense, and again, I would think Hawaii, you know, the Supreme Court relied on a concession there, but I think you're likely bound by the Supreme Court's reasoning relying on that concession even in light of that here. I would also note, and I know we cover this in our briefs, so I don't mean to bore the court, but the district court did treat it as a 12b1 ruling, but as we cite Klayman v. Department of Energy, which is the 1992 opinion of this court, where the court said you can affirm a 12b1 ruling on the basis of 12b6 if the legal reasoning is correct, and so again, we think the legal rule and the reasoning both in Saavedra and as applied here in the district court are correct. The district court just framed it as 12b1 when it should have been framed as a rule of decision. And just to be clear, so on the typology of how we do the steel company jurisdictional framework, the government's position is that consular non-reviewability not only is not subject matter jurisdiction, but it's not a threshold issue in the vein of foreign non-convenience or personal jurisdiction or other things. It's a merits question, but even though it's a merits question, we still have authority, putting aside our precedent, what Judge Pilgrim was talking about, but we still have authority to affirm a jurisdictional dismissal on merits grounds. So I would think that it is a threshold question that establishes a rule of decision. I don't mean to be imprecise. It is, because it, sort of stepping back because it stems from the separation of powers and from, as explained by the court in Saavedra Bruno and sort of relying on Fialo and Herastades, I believe is the pronunciation in Mandel, that it's an issue of, it's a separation of powers question because there's no right of a foreign national to enter this country and to sue and because the plenary authority of the political branches exercising that sovereignty is what's being exercised, that it is something that should be decided, sort of, as a threshold rule of decision, but the Supreme Court clearly, you know, felt that it could go past it in Hawaii. Now, I guess what I mean by threshold is just in the nomenclature that, like, there's, like, rural gas, there's opinions that say that there's a catch of threshold determinations that steel company still allows for deciding at the beginning, like forum non-convenience, but forum non-convenience is still something that you would decide before you get to the merits, and as I understand Trump v. Hawaii, the way it treated consular non-reviewability is not as one of those threshold things like subject matter jurisdiction that you do, that you have to do at the outside before you get to the merits, but as a merits question. It may be one of the first questions you reach, but it seems like it's in the cache of merits questions rather than threshold jurisdictional ones. I think that's probably the right interpretation, because the court did say in Trump v. Hawaii, because now they use jurisdictional, I think, in the subject matter jurisdiction sense, if you look at the Solicitor General's statements around page 12 and 13 of the oral argument transcript, so I think, as I read it, he was conceding that it's not subject matter jurisdiction. I don't think you need to address that here, because the district court did rule on consular non-reviewability, and we believe its ruling was correct, but if that's something the court would like further briefing on, we could certainly provide additional briefing on that issue. My question is, the free access provision in the treaty, you said that this is kind of one shortened version of a standard everyday fair in this landscape. Is that true of all the kind of, is that standard fair too? Your Honor, I want to apologize. I may have introduced some confusion in my language. The Treaty of Amity, and this is also discussed in the Secretary of State Dean Rusk's message to the Senate when he handed this over, and Senator Mansfield's discussion when they introduced it. The Treaty of Amity, which is the treaty between the United States and Thailand, treaties of Amity are shortened versions of the traditional treaty of friendship, commerce, and navigation, and they cite three. We had one that's no longer enforced with Iran, we have one with Ethiopia, and we have this one with Thailand. That's to say that the overall treaty is a shortened version of these friendship, commerce, and navigation treaties. The actual access provision here is, as we point in our brief to a number of other access provisions, nearly identical, and I think my recollection is that Article 1 on the entry is nearly identical to a lot of these treaties, so I didn't mean to say either of those provisions are shortened versions. I meant to say that the treaty as a whole is a shortened version. In terms of both the free access provision and Article 1, those are not unique to this treaty. No, absolutely not, Your Honor. The free access provisions language is identical to a number of other treaties or close to identical. I think we drop a footnote in our brief saying some of them say freedom of access and some of them say free access, and so we use them interchangeably because I apologize, it looked like you were asking a question. No, I was just going to say not to belabor the point, but the question being not just the free access being a standard kind of wording, but the beginning of this Treaty of Amity that talks about the nationals of either party shall be permitted to enter. Is that also a standard kind of word, you know, terminology and provision in either a Treaty of Amity or the longer friendship treaties? Yes, absolutely, Your Honor. That is a common provision. I think it goes towards sort of the concept of the two nations are friends, and so they are allowing the nationals of the other country to enter or, you know, subject to other provisions. We do point out in our brief, and I know I'm short on time, that this treaty, similar to the Treaty of Amity with Iran, which this court in McKesson Corp in 2008 interpreted not to create a private cause of action and merely to provide for issues that the parties would need to, the contracting countries, the treaty signatory countries would need to contract. I think the court in McKesson framed it at 539 F3 at 491 that the Treaty of Amity with Iran, I apologize, I'm over into the to judicial participation in that Treaty of Amity. That's how this court framed it there. We think this treaty, which is identical in the important respect, similarly has an absence of any indication of judicial participation, and that this treaty should be read against the backdrop that, as the court said in Saavedra Bruno, foreign nationals don't have a right to enter the country for which they can sue in our courts. And that's why the court in addressing the Treaty of Amity with Iran said, you know, it didn't create private rights. Again, I know I'm over time, and I don't want to ramble, but we cite the second restatement, which was published a year before this treaty was signed, and I guess then three years before it went into force. The second restatement, I believe it's section 115 comment E, specifically says that these treaties of friendship, commerce, and navigation often speak in terms of rights, but they're not actually creating individual rights. It's meant to be engaged at the level of the parties. Okay. Thank you, Mr. Glover. If my colleagues don't have any further questions, then we'll give Mr. Pollack his rebuttal time. Thank you. I mean, Mr. Pollack, sorry, we'll give you two minutes of rebuttal. Thank you. So I don't think that this court should accept the limitation that the government is putting on the free access provision to the extent that Blanco stands for that. The facts of Blanco are much different than here. Rather than judging this case by the backdrop of consular non-reviewability, I think I would ask the court to look to the actual language of the treaty. The free access provision does not include any such limitation itself. And to the extent that an exception to consular non-reviewability is recognized, that was certainly something that the court in Saavedra Bruno, as well as in Knopf v. Shaughnessy anticipated that there could be another source of law that would allow for court review of consular decisions in particular cases. This is one of those cases we would argue. And so just to pin it down, when you say that notwithstanding the doctrine of consular reviewability, review here is expressly authorized by law, to use the phrase that the court uses in Knopf v. Shaughnessy. The express authorization to which you point is Article I, Section I of the Right, as well as the Article III guarantees of non-discrimination and reasonable behavior on the part of the state, and supplemented by the definitional section in the Immigration and Nationality Act, by which Congress understood the treaty language to mean an entitlement to enter the United States. So I just want to spend my last point, if I may, on our ultravirus argument, which we covered previously a bit. But I would just point out that this court had an opportunity in the Al-Mukrami decision, which had an opportunity to decide that consular non-reviewability applied to a challenge to a State Department policy, the same policy that was described in the PK v. Tillerson decision. And it did not specifically address it, but it also did not disturb the PK Tillerson language that we rely on in part in our reply brief. So with that, unless there are further questions, we will rest. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Henderson, Pillard